IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 5, 2010

## MARCO BUTLER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-24821     W. Otis Higgs, Jr., Judge**

_____

**No. W2009-00860-CCA-R3-PC  - Filed March 12, 2010**

_____

The Petitioner, Marco Butler, appeals from the Shelby County Criminal Court's denial of post-conviction relief from his guilty pleas to first degree murder and especially aggravated robbery, a Class A felony, and his concurrent sentences of life and twenty-five years, respectively.  On appeal, the Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to communicate his release eligibility date.  He also contends that his plea was involuntarily and unknowingly entered.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the Petitioner-Appellant, Marco Butler.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Nicole Germain, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On October 26, 1999, the Petitioner entered guilty pleas to first degree murder and especially aggravated robbery.  On March 20, 2001, the Petitioner filed an untimely post-conviction petition, which the court dismissed as being time barred.  The Petitioner appealed the court's dismissal, claiming that the court should have accepted the petition as filed within the one-year statute of limitations because he gave it to prison authorities for mailing on October 9, 2000.  This court affirmed the post-conviction court's dismissal.  See Butler v. State, 92 S.W.3d 387, 388 (Tenn. 2002).  The Petitioner again appealed, and the Tennessee Supreme Court, concluding that the Petitioner had "made a threshold showing of compliance

with Tennessee Supreme Court Rule 28 section 2(G)," reversed this court's judgment and remanded the case to the Shelby County Criminal Court for an evidentiary hearing to determine whether the Petitioner could establish by a preponderance of the evidence that he had complied with Rule 28 section 2(G). See id. at 391.

The post-conviction court appointed counsel for the Petitioner on February 13, 2003. Following a hearing on June 30, 2004, the court granted the petition to reopen the post-conviction proceedings. On November 21, 2006, appointed counsel for the Petitioner filed an amended petition for post-conviction relief, which included the following claims: (1) trial counsel rendered ineffective assistance in failing to properly prepare and investigate his case, in failing to discuss the case with the Petitioner, and in failing to defend the Petitioner; (2) trial counsel rendered ineffective assistance in erroneously informing the Petitioner that he would be eligible for parole after serving only twelve years of his twenty-five-year sentence pursuant to his plea agreement; (3) the Petitioner's guilty pleas were unknowing, involuntary, and unintelligent as a result of counsel's ineffective assistance regarding his release eligibility; and (4) trial counsel coerced the Petitioner into accepting the plea agreement by "undue verbal pressure" and by having the Petitioner's mother encourage him to accept the plea agreement. On March 24, 2009, the court denied post-conviction relief. An amended order denying post-conviction relief was entered on March 31, 2009.[1] The Petitioner then filed a timely notice of appeal.

**Voir Dire.** On October 25, 1999, the day the trial in this case was set to begin, and prior to the jury being brought in, trial counsel exhaustively examined the Petitioner regarding his decision to forgo an offer from the State and to proceed to trial. During voir dire, the Petitioner acknowledged that his brother, Frederick Butler, was pleading guilty to a lesser charge in exchange for testifying against him for the State. He stated that he initially believed that his brother would not testify against him. The Petitioner also acknowledged that his brother's testimony would be substantially the same as his brother's statement to police, which implicated the Petitioner in the crimes for which he was on trial. He stated that he and his brother were charged with first degree murder of the victim. The Petitioner acknowledged that if he were convicted of first degree murder, he would receive either a life sentence or a life sentence without parole. He said trial counsel explained that he would be eligible for parole after twenty-five years, rather than after fifty-one years under the new law, because of the date of the first degree murder offense.

Specifically, during voir dire, the following pertinent exchange occurred:

---

[1]The March 24, 2009 order and the March 31, 2009 amended order denying post-conviction relief are identical with the exception that the amended order correctly states that the Petitioner entered guilty pleas to the offenses of first degree murder and especially aggravated robbery on October 26, 1999.

DEFENSE COUNSEL: I've also explained to you that the other option is life. Have I not explained that to you?

[PETITIONER]: Yes, sir.

DEFENSE COUNSEL: And that is life with the possibility of parole. Okay. I've explained that to you, have I not?

[PETITIONER]: Yes, sir.

DEFENSE COUNSEL: And I've explained to you that this case falls under the old law prior to the status of life as it is now. Basically you're not eligible for parole until you've served 51 years. But your case falls before that case, before the change of the law. And basically you're eligible for parole after approximately 25 years. You understand that and I've explained that to you?

[PETITIONER]: Yes, sir.

DEFENSE COUNSEL: We've talked about that at length, have we not?

[PETITIONER]: We have.

DEFENSE COUNSEL: Okay. And you understand that you've done five years now. You understand?

[PETITIONER]: Yes, sir.

The Petitioner further stated during voir dire that he understood that Eric Alexander, a co-defendant, would probably testify against him at trial and that trial counsel had told him that Alexander's testimony would likely be unfavorable to him, especially if it corroborated his brother's testimony. The Petitioner stated that he wanted to proceed to trial despite his acknowledgment of the aforementioned facts and consequences and that he was making the decision to proceed to trial freely and voluntarily. He admitted that he had received an offer from the State of life with the possibility of parole, which was the best sentence that he would have received if convicted of first degree murder at trial. The Petitioner also acknowledged that he had been charged with especially aggravated robbery, and if he were convicted of this offense at trial, the trial court would impose a sentence between fifteen and twenty-five years and would determine whether that sentence would be served concurrently with or consecutively to the sentence for the first degree murder offense, if also convicted of that offense. The Petitioner said that he understood that there was a possibility that the

trial court would order his sentences to be served consecutively if he were to be convicted of both offenses at trial.

**Guilty Plea Hearing.** The next day, October 26, 1999, the Petitioner entered his guilty pleas. At the guilty plea hearing, the State summarized the facts in the Petitioner's case:

> Had the matters gone to trial, if Your Honor please, the state would have shown as to [the Petitioner] that on or about August [12,] 1994, officers of the Sheriff's Department received a 911 call to 7918 East Holmes Road at the location of Roane's (phonetically) Grocery Store which is located here in Shelby County, Tennessee, from a citizen who had stopped there at the store and found the owner, Charlie Cantrell, (phonetically) an individual who owned and operated the store, lying dead on the floor of the store next to the drink coolers. Officers from the Sheriff's Department came as well as the Medical Examiner's Office and pronounced the victim dead there.
>
> The death was a result of two gunshot wounds to Mr. Cantrell. Located on the scene, among other things, were two .380 caliber gunshot hulls. The sheriff's officers assigned to investigate the case located a witness, one David Emily (phonetically) who actually called into the Sheriff's Department some information that he had seen before he actually knew . . . what had gone on because he had seen some suspicious behavior [when] he was driving down Holmes Road and he saw a vehicle come up, let two individuals out of that vehicle, go into the store, and a short time later saw the vehicle come back and the two individuals came running out of the store. One of the two individuals had something in his right hand that looked to be a sawed-off shotgun and their behavior was such that it made Mr. Emily suspicious that something . . . had gone on.
>
> He did get a description of the automobile including the license[] plate number. He got to a location where he could make a phone call and did make a phone call. That license[] plate was a Mississippi license[] plate registered to a vehicle that matched the description of the one that Mr. Emily had seen. A broadcast was put out in conjunction with the Marshall County and DeSoto County, Mississippi[,] Police Departments as well as the Byhalia Police Department.
>
> These three agencies recognized the description of that vehicle and went to a location where one of the officers actually saw the red Mustang vehicle. The officer kept it under surveillance and called for other officers and

-4-

backup. [The officer] [d]id follow that vehicle away from that location and stop it. The vehicle was occupied at that time by [the Petitioner], by Eric Alexander, by Frederick Butler, and by an individual named Kendall Holt.

It should be noted that the description of the clothing worn by Mr. Alexander and [the Petitioner] matched the description given by Mr. Emily as that being the two individuals who came running out of Roane's Store when he saw them. And that [the Petitioner] was wearing a red T-shirt and was further described as having his hair in dreadlocks. That was in fact the way [the Petitioner] was dressed and how he was wearing his hair when arrested that same day.

They were transported to DeSoto County Sheriff's Office and held in custody. The car was impounded and did match the description of the type and even down to the particulars of some damage that Mr. Emily had noted. At approximately eight o'clock in the evening that same day, officers of the [Shelby County] Sheriff's Department in conjunction with the Mississippi [o]fficers, advised Mr. Frederick Butler of his Constitutional Rights [at] which time he gave a tape[-]recorded statement indicating that he had in fact been to Roane's Grocery Store driving the red Mustang which he owned and had [the Petitioner] and Eric Dewayne Alexander with him who were the other two individuals arrested.

That they went in and did come back – and robbed the store there. That the store was robbed by the use of a .380 automatic handgun as well as a sawed off shotgun. And the officers then went on to obtain a consent to search signed by both [the Petitioner] and then later Kathy Butler. Went to a location nearby wherein they recovered a .380 caliber handgun, a sawed-off shotgun as well as some other [weapons] – a Derringer and a .25 caliber semiautomatic pistol that they seized at that location.

Also, when [the Petitioner] was arrested and taken into custody . . . he had on him some Kennedy half-dollars and some Susan B. Anthony dollars which were unique, in that, owners and co-workers of the store recognized as being in the cash register of the store and maintained there that had come in that day with some purchases made with a number of Susan B. Anthony dollars.

Further interviews were conducted including [with] Kendall Holt who is now deceased who indicated that Mr. Alexander and [the Petitioner] had gone into the store while Frederick Butler had waited outside in the car and

actually [had] driven the car. Later some further statements were obtained which corroborated to varying degrees this scenario or the account and that's how it was pieced together that [the Petitioner] and Mr. Eric Alexander went into the store while Mr. Frederick Butler drove and all of them did, in fact, . . . split some of the proceeds taken in that robbery.

That would basically be the state's proof had the matter gone to trial. Of course in this trial, further the state's proof would have come from Frederick Butler who is prepared to testify as to the roles of himself and the other two individuals. That would have been the proof that we would have adduced had we gone on with the trial of [the Petitioner] and we'd ask counsel to stipulate.

Defense counsel stipulated that those would have been the facts had the case proceeded to trial. He also made reference to his extensive voir dire of the Petitioner that had occurred just prior to the beginning of trial.

During the guilty plea colloquy, the trial court explained the terms of the plea agreement and extensively questioned the Petitioner before accepting his pleas of guilt. In response to numerous questions from the trial court, the Petitioner stated that he understood that he did not have to plead guilty to the charges of first degree murder and especially aggravated robbery and that he was entitled to a jury trial and an appeal with the assistance of appointed counsel. The Petitioner stated that he was pleading guilty freely and voluntarily, that no one had forced him to plead guilty, and that he was not under the influence of drugs. He stated that he did not have any complaints regarding trial counsel. The Petitioner said that he had read the Petition for Waiver of Trial by Jury and Request for Acceptance of Plea Guilty before he signed it and did not have any questions regarding the document. The trial court accepted the Petitioner's guilty pleas and, pursuant to the plea agreement, imposed a life sentence for the first degree murder offense and a twenty-five-year sentence for the especially aggravated robbery offense, which were to be served concurrently.

**Post-Conviction Hearing.** The Petitioner, the Petitioner's mother, and trial counsel testified at the post-conviction hearing on January 30, 2009. The Petitioner testified that he was sixteen at the time he was charged with the offenses in this case. Although another attorney represented him initially, trial counsel was appointed shortly before trial. The Petitioner said that trial counsel tried to convince him to testify against his brother because his brother was going to testify against him. Trial counsel informed him on the second day of trial that he had received an offer from the State of concurrent sentences of life and twenty-five years. The Petitioner acknowledged that trial counsel told him that because the offense occurred in 1994, he would have to serve twenty-five years before being eligible for

parole. He also said that trial counsel stated, "[Y]ou done a little over five years already. You go out there and do five to six more years on your behavior and you can get out [on parole]." The Petitioner said that he understood that he would not have to serve "more than eleven [years] because [he] had already done five years and three months, and [trial counsel] said five to six more [years]." The Petitioner said that he spoke with trial counsel and his mother prior to deciding to plead guilty:

> [We talked] [a]bout my sentence and my brother['s] sentence. It was like your brother [is] fixing to get a plea deal so he automatic[ally] [is] going [to] do time. [Trial counsel was] telling my mom, explain[ing] to her, about the sentencing range as far as what I signed for, and that was what she talked to me [about] and gave me the impression to go on and sign for it.

The Petitioner said that he never would have pleaded guilty if he had known how long he would be confined before being eligible for parole:

> Only thing I can say, Your Honor, is that I truly felt like I was signing for a twenty-five[-]year sentence and what [trial counsel] was telling me was true, that I had to go out there and do five to six more years on my behavior and I [could] get out. If I knew that I was signing for what I end[ed] up with, I wouldn't have done it.

The Petitioner acknowledged that he understood that he was pleading guilty and that trial counsel did not force him to plead guilty. He stated that he remembered the day he pleaded guilty and claimed that the trial court did not explain how much time he was going to be required to serve.

Peggy Ann Fleming, the Petitioner's mother, testified that trial counsel told her and her son of the State's offer: "I had two sons in jail at that time. [Trial counsel] told me to talk to my son[, the Petitioner]. He offered him twenty-five year[s] with parole, and if he [took] that, [then] he could get out [in] about twelve year[s]." Fleming said that she encouraged the Petitioner to take the State's offer because she believed it was in his best interest. She stated trial counsel told her that pursuant to the State's offer, the Petitioner would have a "twenty-five[-]year [sentence] with parole and he would be out [in] about twelve year[s] with the time he [had] already . . . served."

Trial counsel testified that he was an attorney with the Public Defender's Office and was appointed to represent the Petitioner in October 1999. Counsel stated that another attorney in his office was originally assigned to the case, and he was appointed approximately one month before the Petitioner pleaded guilty. He said that the Petitioner's case was settled after the jury had been chosen but a day or two before the proof was

presented. Counsel stated that the Petitioner pleaded guilty to first degree murder and especially aggravated robbery and received a life sentence and a twenty-five-year sentence, which were to be served concurrently. He said that the State was seeking a life sentence without parole for the first degree murder charge at trial. When asked if he recalled the reason the Petitioner pleaded guilty to the charges, counsel stated:

> Well, the proof was – was fairly strong[;] however, we were informed by the State that [the Petitioner's] brother was going to be called as a witness against him which was something we weren't – I shouldn't say we weren't anticipating it but we weren't – we had thought . . . that [the Petitioner's brother] was not going to testify.

Counsel stated that the fact that the Petitioner's brother was going to testify against him "changed the likelihood of [the Petitioner's] conviction[.]" He said he informed the Petitioner that pursuant to the plea agreement he would be eligible for parole after serving twenty-five years, which meant that the parole board would decide whether he would be released at that time. Counsel stated, "I warned him that . . . if he did take the life sentence that . . . given the fact that murder one is now essentially fifty-one years that I didn't know how they would treat him or whether they would release him [after] twenty-five years." He also told the Petitioner that if he were to be convicted of both offenses at trial, then he believed that the trial court would order the sentences to be served consecutively. When asked if he told the Petitioner that he would be eligible for parole after twelve years, trial counsel stated:

> No, I heard him testify to that and I don't know if he's talking about the especially aggravated robbery again. If . . . what I would have told him if he had a fifteen[-]year sentence, no parole sentence I would have told him that he would have been eligible for release on a no-parole crime after – if there was a fifteen[-]year sentence, assuming he got the fifteen percent good [conduct] credit which – and if he behaved himself that he would – I should say I say this to clients who get fifteen[-]year, no parole sentences that he would be eligible for release.

> But that's actually – I think that's thirteen years actually, thirteen years and some time period. I can't remember, or maybe it's twelve year[s] . . . it's just under thirteen years. But the fact is on this case I wouldn't have bothered going over that on an especially aggravated robbery because of the fact [that] it was running concurrently with the murder [so] I wouldn't have been focused on that sentence.

Counsel stated that he did not coerce the Petitioner into taking the State's offer, and it was the Petitioner's decision to plead guilty to the two offenses. Trial counsel stated that he believed that the Petitioner decided to plead guilty to the offenses because he did not like the idea of his brother testifying against him. Counsel also said that he was prepared to try the Petitioner's case and was prepared for the possibility of having to cross-examine the Petitioner's brother. He also stated that he talked to the Petitioner's mother about the possibility of the Petitioner having to serve consecutive sentences if he were convicted of both offenses at trial.

On cross-examination, counsel stated that the Petitioner was around sixteen or seventeen years old when he was charged with the offenses in this case, and he had been in jail for approximately five and one-half years before his case went to trial. Trial counsel also acknowledged that the Petitioner did not have a juvenile record. Counsel stated that he had tried approximately fifteen first degree murder cases and a large number of second degree murder cases and felony cases.

Trial counsel said that the Petitioner decided to plead guilty after he had some time to think about the offer. Counsel said that the Petitioner had an "above average" understanding of the legal system given his "limited exposure" to it and "seemed to have a great deal more understanding than most of [his] MVU clients." When asked if the Petitioner seemed confused about serving a twenty-five-year sentence for the especially aggravated robbery offense concurrently with a life sentence with parole for the first degree murder offense, trial counsel stated: "I honestly didn't think so at the time[;] however, I've listened to him testify and he may – he may have been [confused] in retrospect[.]" He added, "All I can tell you is that as far as his decision to plead [guilty] I think he had a really good understanding of what the likelihood of his being convicted was."

On March 31, 2009, the court entered an amended order denying post-conviction relief. The post-conviction court found that the Petitioner had failed to prove that trial counsel's conduct was deficient regarding his communication of the Petitioner's release eligibility date.

**Ineffective Assistance of Counsel.** The Petitioner specifically contends that trial counsel was ineffective in failing to communicate his release eligibility date. He also contends that he entered an involuntary and unknowing guilty plea as a result. In response, the State argues that this court should affirm the denial of post-conviction relief because the court properly determined that counsel's performance was not deficient. Specifically, the State contends that the post-conviction court, as was its right, credited the testimony of trial counsel and discredited the testimony of the Petitioner and his mother regarding counsel's communication of the Petitioner's release eligibility date. Finally, the State asserts that the trial court extensively investigated the knowing and voluntary nature of the Petitioner's plea,

and trial counsel's testimony at the post-conviction hearing established that the Petitioner entered a knowing and voluntary plea.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901, n.3 (Tenn. 1992)), perm. to appeal denied (Tenn. Nov. 2, 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct.

2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); see also Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004).

When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242, 89 S. Ct. at 1711. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244, 89 S. Ct. at 1712. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43, 89 S. Ct. at 1712). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligent. Id. These factors include "the relative intelligence of the defendant; the degree of his familiarity with criminal

-11-

proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial." Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

Here, the Petitioner failed to prove that trial counsel's representation was deficient. See Vaughn, 202 S.W.3d at 116. Specifically, the Petitioner failed to show that counsel failed to communicate his release eligibility date. Furthermore, the Petitioner failed to show that but for trial counsel's mistakes, he would not have pleaded guilty and would have proceeded to trial. See Hill, 474 U.S. at 59, 106 S. Ct. at 370; see also Serrano, 133 S.W.3d at 605. The proof at the post-conviction hearing established that trial counsel discussed the offenses, sentence ranges, release eligibility, risks of a trial, and specific terms of his plea agreement with the Petitioner. In addition, trial counsel stressed that the Petitioner could have received a sentence of life without parole had they proceeded to trial because the Petitioner's brother and Alexander, another co-defendant, would have testified against him. Trial counsel also emphasized the possibility of consecutive sentencing if the Petitioner were convicted of both offenses at trial. Although the Petitioner was unfamiliar with the criminal system, trial counsel stated that the Petitioner had an "above average" understanding of the legal process compared to his other clients. The Petitioner acknowledged stating that he was satisfied with trial counsel's representation at the time he entered his guilty pleas. The transcript of the guilty plea hearing shows that the trial court informed the Petitioner that he would be serving a life sentence under the old statute for the first degree murder charge and a sentence of twenty-five years as a Range I, standard offender for the especially aggravated robbery charge and that these two sentences would be served concurrently. At the plea submission hearing the court asked the Petitioner several times if he understood the consequences of his plea, and the Petitioner responded affirmatively. The Petitioner did not ask any questions about the amount of time that he would be required to serve pursuant to the plea agreement. The record shows that trial counsel spoke with the Petitioner about the terms of the plea agreement, the risks of having the Petitioner's brother and Alexander testify against him at trial, and the likelihood of his being sentenced to life without parole and consecutive sentencing if he proceeded to trial. The record further shows that the Petitioner understood the consequences of his plea and voluntarily entered his guilty pleas.

Because the evidence does not preponderate against the findings of fact of the post-conviction court, this court is bound by those findings. See Vaughn, 202 S.W.3d at 115. The court determined that the testimony of trial counsel was more credible than the testimony of the Petitioner and his mother, as was its prerogative. See id. We conclude that the Petitioner failed to prove by clear and convincing evidence that counsel provided ineffective assistance

-12-

or that his guilty pleas were involuntary.  Accordingly, the Petitioner is not entitled to relief.

**Conclusion.**   Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE